# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **ANTHONY G. BROWN**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 13 C 6866 |
| | ) |
| **DR. IMHOTEP CARTER**, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Anthony Brown ("Brown"), a prisoner at Stateville Correctional Center ("Stateville"), has brought this 42 U.S.C. § 1983[1] action against a host of defendants: Stateville's current medical director Dr. Saleh Obaisi, former medical director Dr. Imhotep Carter, former staff physician Dr. Anton DuBrick, Illinois Department of Corrections ("IDOC") Medical Director Dr. Louis Shicker, Wexford Health Sources, Inc. ("Wexford") and Dr. Arthur Funk, Wexford's Regional Medical Director for the northern region of Illinois.[2] Brown charges each of them with the denial of adequate medical treatment, an asserted Eighth Amendment violation.

All defendants have now moved for summary judgment under Fed. R. Civ. P. ("Rule") 56.[3] For the reasons stated here, that motion is granted as to Brown's claim against Wexford, but it is denied as to all other defendants.

---

[1] All further references to that statute will simply take the form "Section --."

[2] All individual defendants except for Dr. Shicker are Wexford employees.

[3] This District Court's LR 56.1, adopted to implement Rule 56, requires parties to submit evidentiary statements and responses to such statements to highlight which facts are disputed and
(continued)

**Summary Judgment Standard**

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).[4] For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir.2002)). But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists (Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir.2008)) and "must come forward with specific facts demonstrating that there is a genuine issue for trial" (id.). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). What follows is a summary of the facts, viewed in the light most favorable to nonmovant Brown.

**Facts**

Brown's lawsuit centers around the treatment -- or rather the asserted lack of treatment -- he received for Hepatitis C while imprisoned at Stateville. Before delving into Brown's

---

(footnote continued)
which are not. This opinion cites to defendants' LR 56.1 statement as "D. St. ¶ --" and to Brown's response to that statement as "B. Resp. ¶ --." Where Brown's response does not provide a version of the facts different from that of defendants, this opinion cites only defendants' statement. Brown's Statement of Additional Facts is cited "B. St. ¶."

[4] At the summary judgment stage, of course, Brown need not "establish" or "show" or "prove" anything, but must demonstrate only that a genuine issue of material fact exists. This opinion employs the quoted terms only because cited cases often use that terminology, but it imposes on Brown the lesser burden described earlier in this footnote.

treatment experience, this opinion provides some context on Hepatitis C and how it is treated in prison.

## General Care and Treatment of Prisoners with Hepatitis C

Hepatitis C is transmitted via blood or body fluid and affects as much as 35 to 40% of the prison population (D. St. ¶¶ 9-10). If untreated it can seriously impact the liver (Shicker Dep. 19:2-19:10), though it doesn't cause such harm to everyone (D. St. ¶¶ 10-11). Roughly 15 to 20% of those with Hepatitis C clear the virus without any symptoms or treatment (D. St. ¶ 11). Of those who do not clear the virus (and therefore go on to develop chronic Hepatitis C), 20 to 30% develop liver cirrhosis -- irreparable damage to the liver's functioning (Shicker Dep. 17:2-17:6, 19:2-19:6). Cirrhosis takes a long time to develop -- nearly 25 years -- so there is time to treat patients, but once cirrhosis sets in it can evolve into liver cancer (Shicker Dep. 17:3-17:6, 19:7-19:10).

Hepatitis C is notoriously difficult to treat and medical opinion regarding treatment evolves continually (Funk Dep. 12:11-12:22; Shicker Dep. 13:23-14:10). So the IDOC, led by Dr. Shicker, works to promulgate new treatment guidelines (the "guidelines") regularly (D. St. ¶ 4). Those guidelines closely track other governmental Hepatitis C guidelines such as those set out by the Federal Bureau of Prisons, Medicare, Medicaid and the Department of Veterans Affairs (D. St. ¶ 15; B. Resp. ¶ 15). Wexford, which contracts with the IDOC to treat the IDOC's prison population, is responsible for adhering to the IDOC's guidelines (D. St. ¶¶ 2, 17). Of course, in addition to abiding by the guidelines Wexford physicians must exercise independent medical judgment in each case (id.).

Under the guidelines Hepatitis C-positive inmates do not automatically receive antiviral medication because of its side effects and cost (id. ¶ 18; B. Resp. ¶ 18). For some individuals the side effects are so severe that they outweigh any benefit to taking the medication, while at the same time it costs tens of thousands of dollars per patient (D. St. ¶ 18; B. Resp. ¶ 18).

Individuals are eligible for treatment only (1) if they are mentally and physically stable, (2) if their disease is sufficiently advanced and (3) if they will be in custody long enough for the treatment to take place (D. St. ¶ 19; Shicker Dep. 15:1-15:13). So once an inmate tests positive for the disease, medical staff must perform what is called an initial "workup" to get some baseline lab work and determine whether there are any conditions that would absolutely bar the patient from receiving treatment (such as instability of mental or physical health) (D. St. ¶¶ 21-22). At that point the patient also gets some preventive care, such as vaccinations against Hepatitis A and B, plus access to education and counseling through a Hepatitis C clinic (D. St. ¶¶ 21-22).

Once it is determined that there are no absolute bars to treatment, the patient undergoes a series of tests to determine whether the disease is sufficiently advanced to warrant treatment (the key metric for that determination is the amount of fibrosis in the liver) (D. St. ¶ 23). Depending on which version of the guidelines applies, the procedure for measuring fibrosis differs slightly. There were three relevant sets of guidelines during the 2011-14 time period at issue here: the March 2010 Guidelines, the August 2012 Guidelines and the May 2014 Guidelines (see D. St. Exs. E-G). But under each of those sets all patients must receive a genotype test to identify which strain of the disease they carry (March 2010 Guidelines 3; August 2012 Guidelines 3; May 2014 Guidelines 3). Patients with genotype "1" of the disease (Brown's genotype) must

then undergo a FibroSpect/FibroSure test -- a proxy for measuring the level of fibrosis in the liver (March 2010 Guidelines 4; August 2012 Guidelines 3; May 2014 Guidelines 3) -- before they are referred for a liver biopsy (a more accurate measure of fibrosis that carries with it a risk of morbidity (Shicker Dep. 30:16-30:24)) -- and for treatment.

According to Dr. Funk the entire process of determining whether a patient is a candidate for treatment generally takes not more than 6 months (Funk Dep. 18:7-18:10). Dr. Shicker testified that it should generally only take about a month or two to complete the initial workup, assuming the patient has no other problems (Shicker Dep. 28:6-29:13; see also March 2010 Guidelines 6; August 2012 Guidelines 8). It also appears from the 2010 and 2012 guidelines that the IDOC contemplated the completion of preliminary testing within approximately two months (see March 2010 Guidelines 6; August 2012 Guidelines 8).

**Brown's Diagnosis and Treatment**

Brown tested positive for Hepatitis C in mid-2011, after he sought medical care for stomach pain and for concerns that something was wrong with his liver (B. Resp. ¶ 31; Brown Dep. 37:17-39:1). It seems likely that the lab transmitted those test results to the wrong location (D. St. ¶ 32; B. Resp. ¶ 32),[5] but they were ultimately associated with Brown's medical file, though it's unclear from the evidence submitted by the parties when that would have occurred. For whatever reason, Brown was not informed of his test results <u>at all</u> in 2011, and he again underwent Hepatitis C testing the following year, on February 28, 2012 (D. St. ¶ 33).

---

[5] Defendants cite to a Grievance Officer's report stating that the results were inadvertently sent to the North Receiving Center. Although that is inadmissible hearsay, there is also testimony by Dr. Funk that the 2011 lab results at least bore the signature of a doctor who worked at North Receiving Center (Funk Dep. 28:5-30:17), evidence that would support the inference that the results may have been initially sent there and then redirected into Brown's file.

After those results quite unsurprisingly signaled another positive finding, Dr. DuBrick informed Brown of his diagnosis on March 21 (D. St. ¶¶ 34-35). Although Dr. DuBrick spent 45 minutes discussing the disease and its potential treatment,[6] he ordered just two of the many required follow-up tests -- a genotype test to determine which strain of the virus Brown carried and a viral load test to measure how much of the virus was circulating in Brown's blood. Moreover, even though Dr. DuBrick also scheduled Brown for the Hepatitis C clinic (D. St. Ex. I 25), after that March appointment and those tests nothing was done to treat Brown for four months. On August 11 (D. St. Ex. I 26) and again on August 29 Brown requested that someone see him for a followup because he was suffering from stomach aches, vomiting and chills (B. St. ¶ 38). Physician's assistant La Tanya Williams scheduled Brown for the Hepatitis C clinic and ordered additional basic testing, including the same viral load test that he'd already received (D. St. ¶¶ 38-39; B. St. ¶ 39).

On September 18, 2012 -- six months after Brown was diagnosed with Hepatitis C <u>for the second time</u> -- Brown saw Dr. Obaisi at the Hepatitis C clinic. Dr. Obaisi ordered some additional required testing and ensured that Brown finally got the necessary Hepatitis A and B vaccines -- four months later than they are usually administered (D. St. ¶¶ 40-41; B. Resp.

---

[6] There is some disparity in views as to precisely when Brown and Dr. DuBrick had that 45 minute discussion. Defendants assert that took place on March 21, when Brown was first notified of his diagnosis, while Brown's response admits that he learned of his diagnosis on March 21 but says that he did not receive education or counseling until May 21 (B. Resp. ¶¶ 34-35). Brown's assertions appear to rest on a self-contradictory reading of the doctor's note. Dr. DuBrick's note states that he informed the patient of his condition <u>and</u> spent 45 minutes speaking with the patient on what is either "3/21" or "5/21," the first numeral being illegible (see D. St. Ex. I 25). In any case the precise timing of education and counseling is not a dispositive issue for summary judgment purposes, so it is not addressed further in this opinion.

¶¶ 40-41). Toward the end of September Brown continued to undergo lab testing, but the entire workup was still far from complete (D. St. ¶¶ 42-43). On October 4, 2012 Brown received pain medication (Tylenol) for the first time (D. St. ¶ 44; B. Resp. ¶ 44). It took another several months to complete the workup (D. St. ¶ 45-53) -- indeed, it was not until February 5, 2013 that medical professionals even performed the FibroSure test (D. St. ¶ 54), a delay that Dr. Shicker admitted was longer than should have been the case (Shicker Dep. 104:7-104:8).

After all was said and finally done, Wexford's doctors concluded that based upon Brown's 1A genotype and his level of fibrosis (F0-F1) he was not eligible for a liver biopsy or for treatment. Instead he underwent regular monitoring (D. St. ¶¶ 54-56, 57-70). In November 2013 Dr. Obaisi prescribed a stronger pain medication (Tramadol) to help Brown with his symptoms (B. ¶ 65). In his deposition, however, Brown testified that he still experiences extreme discomfort from his untreated Hepatitis C, including stomach problems, dizziness and memory loss (Brown Dep. 104:1-105:22).

In his responsive papers Brown argues that he should have been referred for a possible liver biopsy and treatment based upon his APRI score, another measure of fibrosis -- a score that at relevant times appears to have been well in excess of .5, a threshold that the guidelines deem significant[7] (March 2010 Guidelines 4; August 2012 Guidelines 3; May 2014 Guidelines 3). But on the record before this Court Brown's APRI was not even calculated until June 2014 (B. St. ¶ 10).

---

[7] Dr. Shicker testified that what is relevant is not the absolute value of the APRI score but rather the delta of that score over time (Shicker Dep. 59:1-60:16). But the 2010 and 2012 guidelines specify .5 as an absolute threshold that has meaning -- and because a motion for summary judgment is at issue, the facts in that respect must be viewed in the light most favorable to nonmovant Brown.

Specific tests aside, at bottom the record is extraordinarily troubling. It is plain that throughout the entire period at issue here defendants did little to treat Brown, who suffered pain, headaches, vomiting, sweating, chills, nausea, dizziness, memory loss, loss of appetite, insomnia and back pain (B. St. ¶ 20).

### Defendants' Arguments in Support of Summary Judgment

Defendants argue that they are entitled to summary judgment on three grounds: (1) that they were not "deliberately indifferent," as is required to find a violation of the Eighth Amendment, (2) that no reasonable jury could hold Wexford liable under <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 690-91 (1978) because Brown has not proffered any evidence of an unconstitutional "policy" or "custom" and (3) that each of the defendants is entitled to qualified immunity. Though Wexford prevails on the second of those contentions, Brown's case survives against all other defendants.

**Deliberate Indifference**

By virtue of the custodial relationship they have with their prisoners, correctional facilities and their officials have certain basic obligations to provide those prisoners access to medical care, and the Eighth Amendment imposes on them the obligation not to act with deliberate indifference toward an inmate's serious medical needs (<u>Estelle v. Gamble</u>, 429 U.S. 97, 104-05 (1976)). There are two elements of a "deliberate indifference" claim, one objective and one subjective: As for the first, the inmate must have an objectively serious medical condition (a matter not disputed here), while as for the second, defendant must have been subjectively aware of a risk of harm to the inmate but consciously disregarded that risk (<u>Roe v. Elyea</u>, 631 F.3d 843, 857 (7th Cir. 2011)). Of course "[d]eliberate indifference is not medical

malpractice; the Eighth Amendment does not codify common law torts" (Roe, id.) -- instead a violation must involve "subjective recklessness as used in the criminal law" (Farmer v. Brennan, 511 U.S. 825, 835-40 (1994)).  Moreover, the failure to provide adequate treatment must produce an "injury, actual or at least probabilistic" (see Jackson v. Pollion, 733 F.3d 786, 790 (7th Cir. 2013)).

It should however be made clear that failure to treat a "broad range" of medical conditions may meet the deliberate indifference standard (Roe, 631 F.3d at 861).  After all, the Eighth Amendment proscribes any "unnecessary and wanton infliction of pain" (Estelle, 429 U.S. at 104-05; see also Gutierrez v. Peters, 111 F.3d 1364, 1370-73 (7th Cir. 1997)).  To that end our Court of Appeals has repeatedly found that the denial of pain medication, where deliberate, constitutes an Eighth Amendment violation (see, e.g., Smith v. Knox County Jail, 666 F.3d 1037, 1039-40 (7th Cir. 2012) (per curiam), Gutierrez, 111 F.3d at 1370-73 and other cases cited in both of those opinions).

Defendants assert that they are entitled to summary judgment because Brown was never eligible for treatment under the guidelines -- more specifically, that he was not eligible for a liver biopsy or for antiviral medication.[8]  Brown counters that he <u>was</u> eligible for a biopsy and potentially also for antiviral treatment, so that the denial of such treatment ran counter to the Estelle standard.  As will be seen, that response carries a good deal of force.  But even if Brown were not found to be eligible for treatment, he contends that defendants' other inexplicable delays

---

[8] Anticipating that Brown would challenge the constitutionality of the IDOC guidelines themselves, defendants have also argued that the guidelines were constitutional -- but because Brown has not raised such an issue in his response to the motion for summary judgment, this opinion does not address that issue either.

caused him unnecessary pain and suffering that still resulted in an Eighth Amendment violation. Analysis of the parties' competing positions follows.

## Eligibility for Liver Biopsy and Antiviral Treatment

Under both the 2010 guidelines and the 2012 guidelines (in effect until the promulgation of the May 2014 guidelines), a patient with Brown's genotype of Hepatitis C had to receive a FibroSure or a FibroSpect test to determine how severe the fibrosis was in his liver. If based on that test the fibrosis was not very significant, such a patient was not immediately eligible for a biopsy or treatment and he would instead be referred to the clinic for monitoring. Both sets of guidelines also state that "Reconsideration for liver biopsy and treatment should not take place before a two year interval. Consideration at this time should be based on APRI . . . An offender with a ratio of greater than .5 should be referred to the Consultant for liver biopsy/treatment consideration" (March 2010 Guidelines 4; August 2012 Guidelines 3). In addition, the 2012 guidelines state that on reconsideration an additional FibroSpect/FibroSure test "may be ordered" (August 2012 Guidelines 8).

When the facts are viewed in the light most favorable to Brown, coupled with evidence indicating that medical professionals were aware of Brown's diagnosis at some time in 2011,[9] Brown should unquestionably have received the FibroSpect/FibroSure test within a few months of that diagnosis. That means he should have been eligible for reconsideration two years later (some time in 2013) based upon his APRI score, which at all relevant times appears to have been consistently above .5. On those facts and under the plain language of the 2012 guidelines (which

---

[9] Although defendants maintain that Brown's test results were directed to the wrong facility initially, they did ultimately end up in Brown's file.

- 10 -

would have been in effect in 2013), Brown would have been eligible for a referral for a biopsy/treatment consideration. Wexford's physicians cannot leverage their own delay in administering the FibroSure test to argue that his APRI score was irrelevant.

On the other side of the coin, defendants have produced substantial evidence that suggests (1) that the APRI score is effectively a less accurate proxy for what the FibroSure/FibroSpect test more accurately measures and (2) that based on Brown's more accurate FibroSure test results he clearly was ineligible for treatment (Shicker Dep. 26:4-27:2, 91:3-98:12). Moreover, once the May 2014 guidelines kicked into effect, Brown was pretty clearly ineligible for treatment.

While at this summary judgment stage it is not appropriate for this Court to play factfinder and determine which side has the better of the two arguments, the clear language of the 2012 guidelines would appear to have mandated reconsideration based upon the absolute value of Brown's APRI score two years after the FibroSure/FibroSpect test should have been -- but was not -- administered. That language is more than sufficient to pose a factual question as to whether Brown, based upon his APRI score, should have been eligible for a referral for biopsy/treatment consideration in 2013, before the May 2014 guidelines took effect.[10]

---

[10] Brown argues that "at this time" language in the guidelines should be interpreted to means that, at the time of the initial FibroSure/FibroSpect test, consideration for biopsy and treatment should be based on the APRI as well as the FibroSure/FibroSpect test results. That reading is contrary to the plain language of the text. Moreover, Brown's citation to what the Federal Bureau of Prisons guidelines require does not bind this court in its interpretation of the IDOC guidelines, which were modeled on a number of different sets of guidelines, not simply those of the Federal Bureau of Prisons.

## Other Delays in Treatment

Even if that were so (that is, even if a factfinder were to determine that Brown was ineligible for biopsy and treatment), at the very least he should still have received pain medication. But it took nearly two months after his <u>second</u> diagnosis for him to obtain even Tylenol. While delay is not actionable in and of itself under the Eighth Amendment, delay coupled with needless suffering -- evidence of which is present here in abundance -- <u>is</u> actionable.

Moreover, while such facts as Brown's not having timely received his Hepatitis A and B vaccines or his not having been tested for fibrosis until 2013 may not have ultimately injured Brown if he were found to have been ineligible for treatment, the evidence that the medical providers so delayed their provision of care time and time again certainly suffices for a reasonable jury to conclude that the continuing failure to provide Brown medication for his pain -- despite repeated requests -- was not mere negligence, but rather deliberate indifference (see <u>Sellers v. Henman</u>, 41 F.3d 1100, 1102 (7th Cir. 1994) and cases cited there).

**Wexford's Nonliability**

By contrast, Brown's <u>Monell</u> claim against Wexford fails. Corporations that contract with government entities to provide services to inmates can be held liable for deliberate indifference only if they have an official policy or custom that was the "direct cause" or "moving force" behind the constitutional violation (<u>Woodward v. Corr. Med. Servs. of Ill., Inc.</u>, 368 F.3d 917, 927 (7th Cir. 2004) and cases cited there; but see <u>Shields v. Ill. Dep't of Corrs.</u>, 746 F.3d 782, 789-96 (7th Cir. 2014), confirming the <u>Woodward</u> holding but urging reconsideration of the rule). So long as such reconsideration has not taken place, though, liability cannot rest on a

respondeat superior theory (Monell, 436 U.S. at 691). If however a plaintiff cannot point to an official policy that was itself unconstitutional, he may prove liability through "a series of bad acts" that create the inference that "the policy-making level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned . . . the misconduct of subordinate officers" (Woodward, 368 F.3d at 927).

Brown's pleading broadly alleges that Wexford adopted either an unconstitutional policy or custom, but his responsive papers focus upon the latter theory (and he has not submitted any evidence to support the former -- an official policy claim). Basically Brown claims that Wexford's employees persistently denied him appropriate medical care and that their decisions were motivated out of an effort to cut costs, an effort that Wexford condoned.

As plausible a theory as that might be, though, Brown has proffered almost no evidence to tie any of the admittedly numerous delays in treating him to a broader initiative to save costs. It does appear that at one point Dr. Obaisi purportedly told Brown that he would not get antiviral treatment due to its cost (Brown Dep. 44:4-44:12) -- but that single comment is inadequate to prove the kind of pervasive practice that our caselaw demands. "[M]ore evidence than a single incident" is generally required (Calhoun v. Ramsey, 408 F.3d 375, 380 (7th Cir. 2005); see also Shields, 746 F.3d at 796, finding that a series of delays with respect to one individual's treatment is insufficient to support a Monell claim). Instead Calhoun upheld a jury instruction that required a plaintiff to show that what was at work was a "widespread practice that was so permanent and well-settled as to constitute custom or usage with the force of law" (id. at 379).

Because Brown has not proffered sufficient evidence in this area, this Court grants summary judgment in favor of Wexford. That leaves for discussion only the issue of potential qualified immunity for the individual defendants.

**Qualified Immunity**

On that score the individual defendants contend that each of them is entitled to such immunity. As Roe, 631 F.3d at 858 puts the operative standard:

> [Q]ualified immunity shields an official from liability for civil damages, provided that the illegality of the official's conduct was not clearly established at the time he acted.

But most critically for this case, the term "official" for that purpose does not embrace employees of private corporations -- such as Wexford -- that contract with the government (Shields, 746 F.3d at 793). And that being so, any potential invocation of a qualified immunity defense is doomed at the outset as to all of the individual defendants other than Dr. Shicker, who works for the IDOC and not Wexford. And Dr. Shicker fares no better, albeit for a different reason: Brown's right to medical treatment was clearly established (see, e.g., Roe, 631 F.3d at 858-61, expressly holding that prisoners have a clearly established right to individualized medical care for Hepatitis C, and Walker v. Benjamin, 293 F.3d 1030, 1040 (7th Cir. 2002), holding that prisoners have a clearly established right to pain medication).

**Conclusion**

For the reasons articulated at length here, defendants' motion for summary judgment [Dkt. No. 68] is granted in favor of Wexford but is denied as to all other defendants. This action

is set for a status hearing at 9:15 a.m. September 22, 2015 to discuss further proceedings in the case.

                                                                _____
                                                                Milton I. Shadur
                                                                Senior United States District Judge

Date:  September 16, 2015